

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-24-00485-CR

Clay A. **ROBERTS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 63rd Judicial District Court, Val Verde County, Texas
Trial Court No. 2023-0626-CR
Honorable Roland Andrade, Judge Presiding

Opinion by:     Rebeca C. Martinez, Chief Justice

Sitting:         Rebeca C. Martinez, Chief Justice
                 Lori I. Valenzuela, Justice
                 Lori Massey Brissette, Justice

Delivered and Filed: February 4, 2026

AFFIRMED AS MODIFIED

Appellant Clay A. Roberts was convicted by a jury of two counts of smuggling of persons under Texas Penal Code section 20.05(a)(1)(A) and sentenced to forty-two months' imprisonment.[1] In his first issue on appeal, Roberts argues that section 20.05(a)(1)(A) facially violates the First Amendment. In his second and third issues, Roberts argues that the statute is field

---

[1] The judgment signed by the trial court recites that the jury found Roberts guilty of smuggling but incorrectly cites the statute for this offense as Texas Penal Code section 20.05(b) (subsection on punishment).

and conflict preempted by federal law as applied to his prosecution. We affirm Roberts' conviction but *sua sponte* reform the trial court's judgment to conform it with the jury's verdict.

BACKGROUND

While on patrol in Val Verde County in the early morning, Department of Public Safety Trooper Jordan Garner observed a car with a defective taillamp traveling along a public road. The vehicle had tinted windows and was traveling from a Border Patrol checkpoint on a road known by law enforcement to be one used for smuggling. Trooper Garner ran the license plate of the car and noted that the vehicle was registered out of Kerr County. Trooper Garner engaged his lights, and Roberts, who was driving the car, pulled over. After the car came to a stop, four passengers immediately exited the vehicle, while Roberts remained inside. One passenger fled the scene, and the other three passengers waited outside the vehicle. The passengers were in dirty clothes, covered with brush and sticks. Trooper Garner gave Roberts commands to exit the vehicle, but Roberts refused to comply. After approximately ten minutes, U.S. Border Patrol agents arrived to the scene and assisted Trooper Garner in extracting Roberts from the vehicle. Once accomplished, Trooper Garner arrested Roberts.

Border Patrol Agent Brett Price was one of the agents dispatched to the scene. According to Agent Price, the three passengers who remained at the scene were in the country without lawful immigration status. Further, according to Agent Price, Border Patrol agents commonly assist state and local law enforcement agencies in the area because these local agencies do not have the authority to determine immigration status.

Roberts was charged with violating a provision of Texas's anti-smuggling statute, Texas Penal Code section 20.05(a)(1)(A). He was convicted following his jury trial. After conviction, Roberts filed a motion for new trial, raising a First Amendment facial challenge to section

- 2 -

20.05(a)(1)(A) and an as-applied federal preemption challenge to his prosecution under that statute. The trial court denied Roberts' motion. Roberts now appeals from his conviction.

On appeal, Roberts raises the same constitutional challenges as in his motion for new trial. We review these challenges *de novo*, and address them in turn. *See Tex. Mut. Ins. Co. v. PHI Air Med., LLC*, 610 S.W.3d 839, 846 (Tex. 2020); *Ex parte Lo*, 424 S.W.3d 10, 14 (Tex. Crim. App. 2013); *State v. Flores*, 679 S.W.3d 232, 243 (Tex. App.—San Antonio 2023, pet. ref'd).

### FIRST AMENDMENT

In his first issue, Roberts argues that section 20.05(a)(1)(A) facially violates the First Amendment to the United States Constitution. Section 20.05(a)(1)(A) provides: "(a) A person commits an offense if the person knowingly: (1) uses a motor vehicle, aircraft, watercraft, or other means of conveyance to transport an individual with the intent to: (A) conceal the individual from a peace officer or special investigator[.]" TEX. PEN. CODE ANN. § 20.05(a)(1)(A).

Roberts argues,

> Though it is a smuggling statute, [section 20.05(a)(1)(A)] does not require the State to prove that the defendant actually concealed anyone, let alone concealed someone wanted by law enforcement. Instead, the statute's actus reus merely requires the State to prove that the defendant committed an innocuous, common act — driving with a passenger. The legislature didn't enact this statute because it was concerned about that conduct. The statute's focus, then, is its intent element. And under the statute's intent element, that innocent act becomes criminal if the defendant did it with the wrong thought — with the intent to conceal. This suggests that the legislature intended to regulate thought.

According to Roberts, because the statute "focuses on regulating thought" and because it applies a content-based restriction that distinguishes between favored and disfavored thought,[2] strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) ("A law that is content based on its face is subject to strict scrutiny[.]"). Roberts contends that the State has not and cannot

---

[2] As Roberts puts it, "The driver can't form the thought to conceal but can form other thoughts."

satisfy its burden to justify the law under the strict scrutiny standard, so the statute must be declared unconstitutional on its face. *See, e.g.*, *Reed*, 576 U.S. at 172.

## A. Applicable Law

Facial challenges are "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Ordinarily, a plaintiff cannot succeed unless he "'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) and *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). Nevertheless, "to provide breathing room for free expression," the Supreme Court has lowered a "very high bar" and "substituted a less demanding though still rigorous standard" for First Amendment facial claims. *Id.* (quoting *United States v. Hansen*, 599 U.S. 762, 769 (2023)). In this singular context, "the question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ("The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process.").

## B. Application

The first step in a First Amendment facial analysis is to assess the challenged law's scope. *Moody*, 603 U.S. at 724. Scope entails, "[w]hat activities, by what actors, do[es] the law[] prohibit or otherwise regulate?" *Id.* Section 20.05(a)(1)(A) prohibits using a means of conveyance to transport an individual if done with a specific intent — to conceal that individual from a peace officer or special investigator. TEX. PENAL CODE ANN. § 20.05(a)(1)(A). On its face, the law regulates an action — the use of a means of conveyance to transport an individual. For simplicity,

we refer to this action as "transport." That action, or actus reus, if done with the stated specific intent, is a crime. *See id.*

The next step "is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Moody*, 603 U.S. at 725. Roberts focuses only on applications in which a person transports with a "conscious objective" to conceal that is not manifested through any action. *See* TEX. PENAL CODE ANN. § 6.03(a) ("A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."). Roberts contends that section 20.05(a)(1)(A) reaches an "innocuous, common act — driving with a passenger —" if done "with the wrong thought."

However, section 20.05(a)(1)(A) also applies to transport during which a person is actually concealing another. In such cases, section 20.05(a)(1)(A) does not punish mere "preparation, thought or fantasy." *See United States v. Tykarsky*, 446 F.3d 458, 471 (3d Cir. 2006) (rejecting First Amendment facial challenge to 18 U.S.C. § 2423(b), which criminalizes interstate travel for the purpose of engaging in illicit sexual activity). Moreover, in such cases, the relationship between a defendant's "intent to conceal" and transport is neither incidental nor tangential because concealment occurs during transport. *See id.* (making similar point with respect to 18 U.S.C. § 2423(b)). In fact, we have affirmed convictions under section 20.05(a)(1)(A) where there has been actual concealment. *See Elsik v. State*, 678 S.W.3d 360, 364–65 (Tex. App.—San Antonio 2023), *aff'd*, 714 S.W.3d 27 (Tex. Crim. App. 2024) (holding evidence sufficient for jury's finding of intent to conceal a front-seat passenger, where defendant drove a U-Haul truck, evaded detention by speeding up when an officer activated his siren, and thirteen passengers were found under blankets covering the bed of the truck after it was stopped); *see also Abdullah v. State*, No. 04-23-

00773-CR, 2024 WL 3800661, at *8 (Tex. App.—San Antonio Aug. 14, 2024, pet. ref'd) (mem. op., not designated for publication) (holding evidence of a ventilation hole in the roof of a U-Haul truck and defendant's false story about the contents of the truck was "evidence of a level of covertness" that supported the jury's finding of intent to conceal the three passengers found in the back of the U-Haul); *cf. United States v. Gamache*, 156 F.3d 1, 8 (1st Cir. 1998) (observing that the constitutionality of punishing "'mere thought' may pose an interesting subject for academic discourse," but "that is not the way [18 U.S.C. § 2423(b)] is being applied to appellant").

Roberts also argues that an "unusual aspect" of section 20.05(a)(1)(A) is that "it criminalizes an innocent act with the thought to commit an act that is also not criminal."[3] However, Roberts has not tied his "unusual aspect" argument to the balancing of constitutional and unconstitutional applications that we must perform. *See Moody*, 603 U.S. at 725. Moreover, even under Roberts' framing, section 20.05(a)(1)(A) is not "unusual" in applications in which the statute reaches intended concealment that is unlawful — for example, concealment made unlawful by Texas Penal Code section 38.05, which creates an offense for concealment with an intent to hinder the arrest of another. *See* TEX. PENAL CODE ANN. § 38.05.

Thus, the scope of section 20.05(a)(1)(A) covers transport with an intent to conceal that is demonstrated through actual concealment and where concealment is itself unlawful. This sweep is "plainly legitimate." *See Moody*, 603 U.S. at 723. The First Amendment protects the "freedom to think as you will and to speak as you think," *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (citation omitted), but its protections extend "only to conduct that is inherently expressive."

---

[3] Roberts' "unusual aspect" argument relies on inapposite cases, in which the actus reus of the challenged criminal statute is speech or expressive conduct. *See Ex parte Thompson*, 442 S.W.3d 325, 336 (Tex. Crim. App. 2014) (concerning statute that regulated expressive conduct); *Ex parte Lo*, 424 S.W.3d 10, 17 (Tex. Crim. App. 2013) (concerning statute that regulated speech). Roberts does not contend that the actus reus of transport in section 20.05(a)(1)(A) is speech or expressive conduct. Additionally, Roberts cites *Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997), for the proposition that "a statute can contain an actus rea and still *focus* on restricting thought;" but *Reno* too is inapposite because, like *Lo*, it concerned "a content-based regulation of speech." *Id.* at 871.

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006); *see also* U.S. CONST., amend. I ("Congress shall make no law . . . abridging the freedom of speech."); *Bartnicki v. Vopper,* 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."). In applications that include actual concealment, section 20.05(a)(1)(A) punishes non-expressive conduct, which does not raise First Amendment concerns, even if the statute requires the fact-finder to determine intent. *See Wisconsin v. Mitchell*, 508 U.S. 476, 482, 487–88 (1993) (holding statute enhancing punishments for crimes committed because of race did not violate the First Amendment because the statute was "aimed at conduct unprotected by the First Amendment" — not "offensive thought," as the lower court had held); *Smith v. People of the State of Cal.*, 361 U.S. 147, 154 (1959) ("We might observe that it has been some time now since the law viewed itself as impotent to explore the actual state of a man's mind.").

In contrast, Roberts has not identified a single instance of prosecution under section 20.05(a)(1)(A) for thoughts to conceal without action in furtherance of concealment. *See United States v. Hansen*, 599 U.S. 762, 782 (2023) (noting similar failure by defendant asserting First Amendment facial challenge); *cf. State v. Johnson*, 475 S.W.3d 860, 865 (Tex. Crim. App. 2015) ("[T]he danger that the statute will be unconstitutionally applied must be realistic and not based on 'fanciful hypotheticals.'" (citations omitted)). Assuming without deciding that section 20.05(a)(1)(A) could reach as far as Roberts posits, and further assuming that application of the statute to thoughts to conceal without action in furtherance would violate the First Amendment, we cannot say that such applications are "substantial" compared to the statute's constitutional applications. *See Moody*, 603 U.S. at 718; *Hansen*, 599 U.S. at 784–85 (assuming statute reached some protected speech but, nevertheless, overruling First Amendment facial challenge because

"the ratio of unlawful-to-lawful applications is not lopsided enough to justify the 'strong medicine' of facial invalidation for overbreadth."); *see also NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1192 (N.D. Cal. 2025) ("[E]ven where strict scrutiny applies, the plaintiff must show that the applications of the statute that fail strict scrutiny are substantial in comparison to any applications of the statute that do not."). It is doubtful that the State would prosecute if intent to conceal was alleged to be a mental impression only because the State would face a daunting challenge to prove its case beyond a reasonable doubt. *See United States v. Williams*, 553 U.S. 285, 303 (2008) ("The mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." (citation omitted)); *United States v. Kaechele*, 466 F. Supp. 2d 868, 896 (E.D. Mich. 2006) ("The same 'difficulty of proof' . . . likely will serve as a powerful deterrent against the Government prosecuting an individual [under 18 U.S.C. § 2423(b)] who merely travels overseas with impure thoughts unaccompanied by any objective acts indicative of an unlawful intent."); *cf. Ex parte Barrett*, 608 S.W.3d 80, 96 (Tex. App.—Dallas 2020, pet. ref'd) (rejecting First Amendment facial challenge and noting availability of post-conviction as-applied challenge if "the statute is applied overzealously and unrealistically").

Therefore, having considered the scope of section 20.05(a)(1)(A) and explored its full set of applications, and having concluded that any unconstitutional applications are not substantial in comparison to constitutional ones, we overrule Roberts' First Amendment facial challenge. *See Moody*, 603 U.S. at 718.

**PREEMPTION**

Roberts argues in his second and third issues that section 20.05(a)(1)(A) is preempted by federal law as applied to his prosecution.

### A. Applicable Law

#### i.    Preemption

The Supremacy Clause of the U.S. Constitution provides that the federal Constitution, statutes, and treaties constitute "the supreme Law of the Land." U.S. CONST. Art. VI, cl. 2. In effect, the clause provides "a rule of decision" for determining whether federal or state law applies in a particular situation. *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (citation omitted). "If federal law imposes restrictions or confers rights on private actors and a state law confers rights or imposes restrictions that conflict with the federal law, the federal law takes precedence and the state law is preempted." *Id.* (citation omitted).

Preemption will generally fall into three categories: express preemption, implicit field preemption, or implicit conflict preemption. *See Horton v. Kan. City S. Ry. Co.*, 692 S.W.3d 112, 120 (Tex. 2024). "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "State law must also give way to federal law in at least two other circumstances." *Id.* "First, the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* "Second, state laws are preempted when they conflict with federal law." *Id.*

In field preemption cases, the first step is to identify the specific field allegedly preempted. *Kansas*, 589 U.S. at 208. We then consider whether Congress has determined that the field must be regulated by its exclusive governance, to the exclusion of the States. *Arizona*, 567 U.S at 399. Congressional "intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude

enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.* at 401.

"In preemption analysis, courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Id.* at 400 (citations omitted). The States have traditionally occupied criminal law enforcement; however, they have not traditionally occupied immigration enforcement. *Kansas*, 589 U.S. at 210, 212 (noting that while federal law "makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders," criminal law enforcement has been and is "primarily a responsibility of the States") (quoting *Arizona*, 567 U.S. at 401–02).

Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Conflict preemption may arise when a state grants state actors "the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402. Conflict preemption may also arise when a state imposes its own penalties for a federal offense. *Id.* However, some overlap of state and federal laws is allowed, as the Supreme Court observed:

> In recent times, the reach of federal criminal law has expanded, and there are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors. Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law

whenever they overlap, and there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap. Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests.

*Kansas*, 589 U.S. at 212.

### ii.   As-Applied Preemption

For as-applied constitutional challenges, we must determine whether there was a constitutional violation in the application of the statute to the defendant. *See State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011). "A litigant raising only an 'as applied' challenge concedes the general constitutionality of the statute, but asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *Id.*

In *State v. Flores*, we held that section 20.05(a)(1)(A) was not facially preempted, but we did not address whether the statute was preempted as applied to the appellants in that case because, unlike Roberts, the appellants had not briefed the issue. *Flores*, 679 S.W.3d at 244.

## B. Application

Roberts does not argue that section 20.05(a)(1)(A) was expressly preempted. Instead, he argues the statute was implicitly preempted, as applied to his prosecution, because Congress completely ousted the States from regulating in the "field of noncitizen smuggling," and because Roberts' prosecution conflicts with federal immigration laws and prosecutorial prerogatives.

For field preemption, Roberts identifies the relevant field as "noncitizen smuggling" or "the smuggling of noncitizens." *See Kansas*, 589 U.S. at 208. He argues the manner the State applied section 20.05(a)(1)(A) to him was field and conflict preempted by the federal anti-smuggling statute, 8 U.S.C. section 1324, which prohibits:

(1)(A) Any person who —

(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; [or]

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law[,]

shall be punished as provided in subparagraph (B).

8 U.S.C.A. § 1324(a)(1)(A)(i-iv). Under this statute, the federal government must prove the individual smuggled was illegally present and the alleged smuggler knew or recklessly disregarded that the individual smuggled lacked legal authorization. *See, e.g.*, *United States v. Foreman*, 84 F.4th 615, 622 (5th Cir. 2023) ("[T]he elements of the crime of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) are that: (1) an alien was in the country illegally; (2) the defendant knew or recklessly disregarded the fact that the alien was illegally present in the United States; and (3) the defendant transported the alien with the intent to further the alien's unlawful presence."). Thus, "[t]he aliens' status is an element of the crime" and key to sustaining a conviction under the federal law. *United States v. Alvarado–Machado*, 867 F.2d 209, 212 (5th Cir. 1989).

Federal and state courts generally agree that under 8 U.S.C. section 1324, "state regulation that specifically targets the smuggling of noncitizens is preempted because the clear and manifest purpose of Congress was to completely oust state power from this area of regulation leaving no room for analogous state crimes." *Flores*, 679 S.W.3d at 244; *see also Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) (*GLAHR)* ("The comprehensive nature of these federal provisions is further evident upon examination of how § 1324 fits within the larger context of federal statutes criminalizing the acts undertaken by aliens and those who assist them in coming to, or remaining within, the United States."); *United States v. South Carolina*, 720 F.3d 518, 531 (4th Cir. 2013) ("The federal government has clearly occupied the field of regulating the concealing, harboring, and transporting of unlawfully present aliens."); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1025 (9th Cir. 2013) ("[I]n developing the scheme for prohibiting and penalizing the harboring of aliens, Congress specifically considered the appropriate level of involvement for the states. Section 1324(c) allows state and local law enforcement officials to make arrests for violations of § 1324. Congress did not, however, grant states the authority to prosecute § 1324 violations, but instead vested that power exclusively in the federal authorities.").

Courts generally find state human smuggling statutes facially field preempted where the immigration status of the individual smuggled, concealed, or transported is an explicit element of the crime, whether by the alleged smuggler's knowledge of the smuggled person's immigration status, or based directly on the person's status. *See, e.g.*, *GLAHR*, 691 F.3d at 1256 (describing Georgia law for "transporting or moving an illegal alien," which made it a crime for a person, "while committing another criminal offense, [to] *knowingly and intentionally transport[] or move[] an illegal alien* in a motor vehicle for the purpose of furthering the *illegal presence* of the

- 13 -

alien in the United States." (emphasis added)); *United Staes v. Alabama*, 691 F.3d 1269, 1285 (11th Cir. 2012) (describing Alabama law criminalizing "(1) concealing, harboring, or shielding an *unlawfully present alien* from detection, or attempting to do so; (2) encouraging or inducing an *unlawfully present alien* to "come to or reside in" Alabama; (3) transporting, attempting to transport, or conspiring to transport an *unlawfully present alien*, including an alien's conspiracy to be transported; and (4) harboring an *unlawfully present alien* by entering into a rental agreement with that alien." (emphasis added)); *South Carolina*, 720 F.3d at 530 (describing South Carolina law that made "it a state felony to 'transport, move or attempt to transport' or 'conceal, harbor or shelter' a person 'with intent to further that person's *unlawful entry into the United States*' or to help that person avoid apprehension or detection." (emphasis added)); *Valle del Sol*, 732 F.3d at 1013 (describing Arizona law making it unlawful to "[c]onceal, harbor or shield or attempt to conceal, harbor or shield an alien from detection in any place in this state, including any building or any means of transportation, if the person knows or recklessly disregards the fact that *the alien has come to, has entered or remains in the United States in violation of law*." (emphasis added)). Thus, several courts have found that the federal government has ousted the states from enacting smuggling statutes where it is *necessary* to establish a noncitizen's illegal presence to sustain a conviction. *See Flores*, 679 S.W.3d at 244 ("[S]tate regulation that *specifically* targets the smuggling of noncitizens is preempted[.]" (emphasis added)).

However, unlike the instances where courts have found state statutes to be field preempted, section 20.05(a)(1)(A) does not require prosecutors to prove a noncitizen's illegal presence in the United States. In fact, Agent Price testified at Roberts' trial that Border Patrol agents are regularly called to assist state and local law enforcement agencies because these agencies lack the authority to make immigration determinations.

More to the point for Roberts' as-applied challenge, his conviction did not turn on immigration status. Prosecutors alleged only his intent to conceal individuals from law enforcement, and the trial evidence indicated that Roberts wished to conceal his passengers from all law enforcement. Roberts had been driving in the early morning in a vehicle with tinted windows along a corridor known by law enforcement to be one used by smugglers. Roberts' passengers were covered in dirt, which, in conjunction with the route chosen, could suggest that his passengers had been hiding in the brush.

Nothing required the State to prove the passengers' unlawful status or that Roberts knew his passengers' actual immigration status. In this respect, section 20.05(a)(1)(A) is much like the fraud statute the Supreme Court considered in *Kansas v. Garcia*, which only indirectly implicated the federal immigration scheme. In *Kansas v. Garcia*, "Kansas law made it a crime to commit 'identity theft' or engage in fraud to obtain a benefit." 589 U.S. at 195. The defendants in that case, three noncitizens without work authorization, were "convicted under these provisions for fraudulently using another person's Social Security number on state and federal tax-withholding forms that they submitted when they obtained employment." *Id.* Like section 20.05(a)(1)(A), the Kansas statute did not contain any express provisions regarding immigration status of the person committing the crime. Nevertheless, the defendants argued that because the alleged fraud related to work authorization in the United States, it necessarily implicated the federal employment verification system and, the defendants further argued, federal regulation implicitly precluded state regulation in "the field of fraud on the federal employment verification system." *Id.* at 208–09. The Court rejected the defendants' argument, noting that while federal law "makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens

within the Nation's borders[,] federal law does not create a comprehensive and unified system regarding the information that a State may require employees to provide." *Id*.

Likewise, with smuggling, while federal law provides a comprehensive and uniform system for "determin[ing] . . . who should or should not be admitted into the country," *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), federal law does not create a comprehensive and unified system regarding the concealment of persons from law enforcement. As we noted in *Flores*: "Federal law specifically allows for state laws that target traffickers of noncitizens[, and] Congress did not intend to preempt neutral state smuggling statutes like section 20.05(a)(1)(A)." *Flores*, 679 S.W.3d at 245 (citing 22 U.S.C.A. § 7105(c)(3)(A), (C)). Roberts was prosecuted under this neutral statute, and his conduct was criminal regardless of his passengers' immigration status. We hold, on this record, that Roberts' prosecution was not field preempted. *See Kansas*, 589 U.S. at 208–09; *Flores*, 679 S.W.3d at 245; *see also Gutierrez v. State*, 721 S.W.3d 639, 655 (Tex. App.—Corpus Christi–Edinburg 2025, pet. filed) (holding section 20.05(a)(1)(A) was not field preempted where the evidence showed appellant "was not convicted merely because of the citizenship status of the back seat passengers, but because she intended to conceal those individuals from law enforcement"); *Minor v. State*, No. 07-23-00397-CR, 2025 WL 211324, at *3 (Tex. App.—Amarillo Jan. 15, 2025, no pet.) (mem. op., not designated for publication) (rejecting appellant's as-applied preemption challenge where trial evidence "demonstrate[d] Appellant was convicted not because of his passengers' citizenship status, but because he intended to conceal individuals from law enforcement. . . . [S]uch conduct is criminalized regardless of immigration status.").

As to conflict preemption, state anti-smuggling and harboring laws that target non-citizens may be preempted if they conflict with federal immigration law. *See Arizona*, 567 U.S. at 399; *Alabama*, 691 F.3d at 1287 (holding Alabama's anti-harboring statute "undermines the intent of

Congress to confer discretion on the Executive Branch in matters concerning immigration."); *South Carolina*, 720 F.3d at 531–32 (finding conflict preemption where state anti-smuggling statute created "an obstacle to the smooth functioning of federal immigration law, improperly place[d] in the hands of state officials the nation's immigration policy, and strip[ped] federal officials of the authority and discretion necessary in managing foreign affairs."); *Valle del Sol*, 732 F.3d at 1027 ("By allowing state prosecution of the same activities in state court, Arizona has conferred upon its prosecutors the ability to prosecute those who transport or harbor unauthorized aliens in a manner unaligned with federal immigration enforcement priorities."). With an as-applied conflict preemption challenge, the application of the law must conflict with federal law's comprehensive immigration scheme or with the federal government's discretion over immigration-related prosecutions. *See Flores*, 679 S.W.3d at 246–47.

Evidence from Roberts' trial, however, does not show that his prosecution interfered with federal law or federal discretion over immigration-related prosecutions. Instead, the evidence shows that Trooper Garner, a Texas law enforcement officer, arrested Roberts with assistance from Border Patrol agents. According to trial evidence, state officers did not determine immigration status or enforce federal immigration laws; these tasks were left to the Border Patrol agents who arrived on the scene to assist. The record does not suggest that federal prosecutors wished to pursue federal charges against Roberts, and, as described above, Roberts' conviction did not turn on the immigration status of his passengers. On this record, we hold that Roberts' prosecution under section 20.05(a)(1)(A) was not preempted through conflict with federal law. *See Kansas*, 589 U.S. at 211 ("the mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption.");

*Gutierrez*, 721 S.W.3d at 657 (citing *Kansas* in rejecting appellant's as-applied conflict preemption argument regarding section 20.05(a)(1)(A)).

## CLERICAL ERROR IN THE WRITTEN JUDGMENT

The trial court's judgment identifies the "Statute for Offense" as "Sec. 20.05(b) Penal Code." Roberts, however, was charged and convicted under Texas Penal Code section 20.05(a)(1)(A). We have the authority to modify incorrect judgments when the necessary information is available. TEX. R. APP. P. 43.2(b); *see Minor*, 2025 WL 211324. Accordingly, we modify the judgment of conviction to state that the "Statute for Offense" is "20.05(a)(1)(A) Penal Code."

## CONCLUSION

We affirm the judgment of the trial court as modified.

Rebeca C. Martinez, Chief Justice

PUBLISH